# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

AMERICA CARGO TRANSPORT, INC., a
Corporation,
           *Plaintiff-Appellant,*

v.

UNITED STATES OF AMERICA,
           *Defendant-Appellee.*

No. 08-35010

D.C. No.
CV-05-00393-JLR

AMERICA CARGO TRANSPORT, INC., a
Corporation,
           *Plaintiff-Appellant,*

v.

UNITED STATES OF AMERICA,
           *Defendant-Appellee.*

No. 08-35276

D.C. No.
2:05-cv-00393-JLR

OPINION

Appeal from the United States District Court
for the Western District of Washington
James L. Robart, District Judge, Presiding

Argued and Submitted
September 1, 2010—Seattle, Washington

Filed November 5, 2010

Before: Michael Daly Hawkins and M. Margaret McKeown,
Circuit Judges, and Thomas J. Whelan,
Senior District Judge.*

*The Honorable Thomas J. Whelan, Senior United States District Judge
for the Southern District of California, sitting by designation.

18307

Opinion by Judge McKeown

**COUNSEL**

Timothy R. Lord and Vickey L. Quinn, San Francisco, California, for the plaintiff-appellant.

Brian Kipnis and Thomas Merton Woods, Assistant United States Attorneys, Seattle, Washington, for the defendant-appellee.

**OPINION**

McKEOWN, Circuit Judge:

This appeal centers around federal cargo shipping preferences related to the United States government's Food for Peace program. Specifically, we consider whether the govern-

ment's changed position with respect to the administrative process governing international food aid shipments moots this appeal and whether the government is nonetheless subject to money damages for failing to comply with those requirements.

## BACKGROUND

America Cargo Transport, Inc. ("ACT") filed suit against the United States government, naming the Department of State Agency for International Development ("USAID") and the Department of Transportation Maritime Administration ("MARAD") as defendants.[1] ACT's amended complaint alleges a violation of federal cargo preference laws and requests injunctive and declaratory relief as well as damages for unjust enrichment. ACT also moved for attorney's fees and costs under the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412.

Under Title II of the Food for Peace program, 7 U.S.C. § 1721, Congress authorized USAID to distribute food aid worldwide to countries in need and to "promote economic and community development." *Id.* Shipping food overseas is not a simple matter from a regulatory point of view, as the process implicates multiple agricultural, shipping, and other laws and regulations.

To transport food to foreign countries, USAID works with organizations that receive bids directly from cargo carriers that transport the food shipments. *See id.* § 1722. The Cargo Preference Act of 1954 ("CPA"), 46 U.S.C. § 55305(b), provides that USAID must take steps to ensure that fifty percent of the gross tonnage of commodities under Title II are transported on U.S.-flag vessels "to the extent those vessels are

---

[1]ACT also sued the Community Credit Corporation ("CCC"). Since ACT makes no arguments specific to its claims against CCC, we do not consider these claims on appeal.

available at fair and reasonable rates." *Id.* Where agricultural commodities, like the vegetable oil at issue here, are involved, the Food Security Act ("FSA") requires an additional twenty-five percent of the gross tonnage be shipped on U.S.-flag vessels, *see* 46 U.S.C. § 55314(a)(1), raising the minimum to seventy-five percent. The cargo preference regulation relevant to this case provides that "each full shipload of cargo" must be shipped on a U.S.-flag vessel, unless MARAD agrees with USAID that (a) such "vessels are not available at fair and reasonable rates," or (b) there is a "substantially valid reason" for using a foreign-flag vessel. 46 C.F.R. § 381.5.

In February 2005, two freight forwarders for eligible organizations issued solicitations for ocean transportation of Title II food aid—specifically, 5,660 metric tons of vegetable oil—from Texas to multiple port destinations in India. These solicitations provided that the "lowest responsive offeror meeting the mandatory requirements of the solicitations" would receive the bid. Maersk Sea-Land ("Maersk") offered to transport a *portion* of the vegetable oil for $125 per metric ton, and ACT offered to transport the full shipload for $520 per metric ton. Both offers were Priority 1 ("P1") bids, or bids for transport on U.S.-flag vessels. USAID recommended that the organizations award the contract for the partial shipment to Maersk. USAID recommended awarding the remainder of the vegetable oil shipment to Priority 2 and 3 bids—those involving either partial or full shipment on a foreign-flag vessel—because ACT had not offered to transport less than a full shipload and there were no other offers from P1 vessels.

ACT claims that the vessel offered by Maersk was not actually a P1 vessel (i.e., not a U.S.-flag vessel), and that if USAID had sought MARAD's concurrence, as USAID was required to do under 46 C.F.R. § 381.5, it would have discovered that fact and recommended acceptance of ACT's bid. Under USAID's interpretation of § 381.5, the agency was not required to seek MARAD's concurrence. MARAD viewed the process differently, claiming that USAID needed

MARAD's concurrence because ACT offered to carry a full shipload of cargo.

In April 2006, in the midst of ongoing discovery disputes, and upon a joint stipulation of the parties, the district court stayed the proceedings to allow the Department of Justice to reconcile this conflict between the federal agencies and to determine the government's litigation position going forward. The court extended the stay through October 2006, but the stay expired prior to a resolution of the dispute between USAID and MARAD. Nonetheless, almost a year later, in its motion for summary judgment, the government advised the district court that the dispute between USAID and MARAD had been resolved in favor of MARAD, which took the same position as ACT. The government stated that "MARAD's concurrence is required prior to accepting an offer to carry less than a full shipload of cargo, if a shipping company has offered to carry a full shipload of cargo on a P1 vessel, and that offer is responsive and otherwise meets the agency's needs." In short, the Government "do[es] not dispute that USAID was required by 46 C.F.R. § 381.5 to recommend that the ACT offer be accepted."

The district court granted the government's motion for summary judgment, finding ACT's § 381.5 claims for injunctive and declaratory relief moot because "the Government . . . adopted ACT's position that USAID was required to seek a concurrence from MARAD before making a recommendation about the cargo and has conceded that doing so would have led to ACT being awarded the bid." The district court also dismissed ACT's claims for unjust enrichment and money damages, concluding that the government had not waived its sovereign immunity under the Suits in Admiralty Act ("SAA"), 46 U.S.C. § 30903. Finally, the district court denied ACT's motion for attorney's fees and costs under EAJA.

**ANALYSIS**

## I.  MOOTNESS OF CLAIMS UNDER 46 C.F.R. § 381.5

We first consider whether this appeal is moot in light of the government's changed position on the issue that is at the heart of the suit—the requirement of MARAD review. The district court found ACT's claims for injunctive and declaratory relief under 46 C.F.R. § 381.5 were moot because the United States adopted ACT's position going forward—that USAID was required to seek MARAD's concurrence before making a recommendation about the cargo because ACT offered to carry a full shipload. We agree.

**[1]** Courts are understandably reluctant to declare a case moot based on the defendant's voluntary cessation of the challenged activity. *See, e.g.*, *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 190 (2000) ("[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur."); *United States v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953) (noting the defendant's burden of "demonstrat[ing] that there is no reasonable expectation that the wrong will be repeated . . . is a heavy one" (internal quotation marks omitted)). Nevertheless, where there is "no reasonable . . . expectation that the alleged violation will recur," and where "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation," the case is moot. *County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979) (internal quotation marks omitted).

**[2]** ACT argues that its § 381.5 claims are not moot because the government has not met the heavy burden of showing that it would not repeat the "same illegal conduct" in the future. This argument is unavailing. The government was faced with conflicting agency interpretations and resolved the interpretive dispute in favor of MARAD. This approach mir-

rors ACT's claims, thus mooting any need for declaratory relief. Because the shipment at issue has already been completed—the ship has in this case literally sailed—ACT's claim for injunctive relief is moot as well.

[3] ACT's effort to forestall mootness by characterizing the government's action as "strategic mootness" does not save the day. The fact is the government changed its policy and agreed with ACT. Although this change certainly affects the litigation, there is no basis to suggest it is a transitory litigation posture. At a hearing before the district court on the government's motion for summary judgment, counsel for the government emphasized: "The government's position is [changed] to the new permanent . . . policy set forth in our summary judgment papers. We stand by that."

[4] The government's change of policy presents a special circumstance in the world of mootness. Of course there is always the possibility of bad faith and a change of heart. But, unlike in the case of a private party, we presume the government is acting in good faith. Our prior cases are consistent with this principle, *see, e.g.*, *White v. Lee*, 227 F.3d 1214, 1243 (9th Cir. 2000) (holding that permanent change in HUD's policy with respect to Fair Housing Act investigations was sufficient to render plaintiff's claim moot); *Lyons v. City of Los Angeles*, 615 F.2d 1243, 1245-46 & n.4 (9th Cir. 1980) (finding "[t]he city attorney has now announced an official policy" and that "given the change in policy, there is not a strong possibility of a recurrence of the behavior of which the appellant complains"), and our sister circuits abide by this presumption.

[5] The Seventh Circuit's approach reflects the prevailing norm: "[C]essation of the allegedly illegal conduct by government officials has been treated with more solicitude by the courts than similar action by private parties." *Ragsdale v. Turnock*, 841 F.2d 1358, 1365 (7th Cir. 1988) (citing 13A Charles Allan Wright, Arthur R. Miller & Edward H. Cooper,

*Federal Practice and Procedure* § 3533.7, at 353 (2d ed. 1984)). As the court noted, "[a]nalogous assurances of discontinuance of the challenged conduct have been held to render challenges moot in other cases." *Id.* In the years since *Ragsdale*, other courts have followed the same principle of deference. *See, e.g.*, *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1117 (10th Cir. 2010) (requiring, to deny mootness, "*clear showings*" of a governmental "desire to return to the old ways"); *Coral Springs St. Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1328-29 (11th Cir. 2004) ("[G]overnmental entities and officials have been given considerably more leeway than private parties in the presumption that they are unlikely to resume illegal activities."); *Ammex, Inc. v. Cox*, 351 F.3d 697, 705 (6th Cir. 2003) (noting that cessation of conduct by the government is "treated with more solicitude . . . than similar action by private parties").

**[6]** The specific question that gave rise to the suit—consultation with MARAD—was resolved in ACT's favor. Because we no longer have a concrete case or controversy before us, we affirm the district court's dismissal of ACT's claims for declarative and injunctive relief as moot.

## II.   MONEY DAMAGES AND THE SUITS IN ADMIRALTY ACT

In addition to challenging the government's earlier interpretation of the shipping regulation, ACT seeks monetary damages, alleging that its bid was "wrongly rejected by USAID in favor of substantially lower bids submitted by foreign flagged carriers." The district court dismissed this claim on the ground that the United States has not waived its sovereign immunity in this case. Because this case does not fall within the exception to sovereign immunity in the SAA, we affirm.

**[7]** As a general rule, "[t]he United States, as sovereign, is immune from suit save as it consents to be sued, . . . and the terms of its consent to be sued in any court define that court's

jurisdiction to entertain the suit." *Hercules, Inc. v. United States*, 516 U.S. 417, 422 (1996) (internal quotation marks omitted). The SAA's sovereign immunity exception provides as follows:

> In a case in which, if a vessel were privately owned or operated, or if cargo were privately owned or possessed, or if a private person or property were involved, a civil action in admiralty could be maintained, a civil action in admiralty in personam may be brought against the United States or a federally-owned corporation.

46 U.S.C. § 30903(a).

**[8]** Whether the United States has waived sovereign immunity in connection with shipping under the Food for Peace program is a question of first impression for our court. As the text of the SAA makes clear, the waiver of sovereign immunity applies only where a private party would be liable under admiralty law for the same conduct. *See Taghadomi v. United States*, 401 F.3d 1080, 1083 (9th Cir. 2005) (noting that the SAA waiver of sovereign immunity applies "in any case in which, if a private person or property were involved, a proceeding in admiralty could be maintained" (internal quotation marks omitted)).

**[9]** ACT's alleged injury is that USAID wrongly rejected ACT's bid in violation of the federal laws governing cargo preference and food safety. But those laws—the Cargo Preference Act and the Food Security Act—regulate only the government's conduct. Because a private party could not be liable under either the CPA or FSA, the statutory waiver is inapplicable here. As the district court succinctly stated, "the fatal flaw of [ACT's] argument is that no private person could be sued for a violation of the cargo preference laws or the federal regulations implementing them. The relevant statutes and regulations are directives to be followed by the Government, not

private persons." Simply put, these laws regulate government, not private, conduct.

An analogous situation arises in the context of the Federal Tort Claims Act ("FTCA"), which provides a waiver of sovereign immunity "if a private person[ ] would be liable to the claimant." 28 U.S.C. § 1346(b)(1). On the basis of this language, "courts have held that the FTCA applies only if state law would impose liability on private persons under similar circumstances." *Woodbridge Plaza v. Bank of Irvine*, 815 F.2d 538, 543 (9th Cir. 1987).

The case of *Westbay Steel, Inc. v. United States*, 970 F.2d 648 (9th Cir. 1992), is instructive. Westbay was a subcontractor of a construction company, Kardan Construction, Inc. ("Kardan"), that the Federal Aviation Administration ("FAA") hired to construct an airport service station. *Id.* at 649. Kardan and proposed sureties executed a payment bond to comply with the Miller Act, 40 U.S.C. § 3131 (formerly 40 U.S.C. § 270a(a)), and an FAA officer approved the sureties. *Westbay*, 970 F.2d at 649-50. The Miller Act provides that a federal contracting officer should not approve a contract without ensuring adequate surety. 40 U.S.C. § 3131. When the contract fell through, Westbay filed suit against the United States under the FTCA, alleging that the FAA contracting officer negligently approved the sureties. *Westbay*, 970 F.2d at 649-50. We held that the contracting officer's alleged negligent approval of the surety bond was not cognizable under the FTCA. *See id.* at 651. Because the Miller Act governs only the actions of federal employees, there was no analogous private conduct for the failure to use reasonable care in the approval of sureties and the FTCA thus did not apply. *See id.* at 650-51. The same rationale applies here.

Nor are we persuaded by the cases cited by ACT, as they involve situations in which a plaintiff would have a claim under maritime law were a private party in the government's shoes. *See Asta Eng'g, Inc. v. United States*, 46 Fed. Cl. 674

(2000) (seeking cancellation of government contract with third party because it interfered with plaintiff's own contract with government), *abrogated on other grounds by Red River Holdings, LLC v. United States*, 87 Fed. Cl. 768 (2009); *N. Metal Co. v. United States*, 350 F.2d 833 (3d Cir. 1965) (considering an action to recover sum of money allegedly deducted from payment in bad faith); *Gen. Marine Constr. Corp. v. United States*, 738 F. Supp. 586, 587 (D. Mass. 1990) (alleging harm resulting from "failure of dredge inspectors to appear in a timely manner").

**[10]** In sum, because a private party would not have been subject to the CPA or FSA or their implementing regulations —and because ACT would therefore have no claim against a private party in the government's shoes—the government has not waived sovereign immunity under the SAA. We affirm the district court's dismissal of the claim for damages.

## III.   FEES UNDER THE EQUAL ACCESS TO JUSTICE ACT

**[11]** The district court appropriately denied ACT's EAJA claim for attorney's fees and costs based on the determination that ACT was not a "prevailing party." *See* 28 U.S.C. § 2412 (permitting an award of fees and costs to a prevailing party where the government's position was not substantially justified).

To be a prevailing party, a litigant must "achieve a material alteration of the legal relationship of the parties[,]" and the alteration must be "judicially sanctioned." *Carbonell v. INS*, 429 F.3d 894, 898 (9th Cir. 2005) (internal quotation marks omitted). ACT does not qualify as a prevailing party because its regulatory victory was the result of the government's voluntary behavior, not judicial action. *See Perez-Arellano v. Smith*, 279 F.3d 791, 794 (9th Cir. 2002) ("[A] 'prevailing party' under the EAJA must be one who has gained [a material alteration] by judgment or consent decree."). We need not

address whether the government's position was "substantially justified."

**AFFIRMED.**